No. 29.—L. M. WILEY, PARISH & Co. plaintiffs in error, *vs.* C. & G. H. KELSEY, defendants in error.

[1.] Where, by an agreement of the parties, a cause is submitted to the Court for its judgment and decision upon *the facts*, as well as *the law*, this Court will indulge the same presumption in regard to the facts, on a motion for new trial, as if the cause had been submitted to a Jury, and will not disturb the judgment when there is any evidence in the record to sustain it, or when there is a conflict of evidence: but if there is no evidence in the record to support the judgment, a new trial will be granted.

Motion, in Houston Superior Court.  ——— Term, 1852. Heard and decided by Judge IRWIN, presiding for Judge POWERS.

At the April Term, 1839, of Houston Superior Court, L. M. Wiley, Parish & Co. obtained judgment against T. & S. Williams, for the sum of $1793 96 cts. principal.  Execution issued therefor on the 18th day of May, 1839.

The correct amount was inserted in the face of the execu-

tion, but on the back of it was for $753 96; the same entry was made on the execution docket.

The only entry which appeared upon the execution, was a receipt in the handwriting of the late Judge *Tracy*, for $186 46 cts. but not signed by him, dated January 25th, 1850.

At the October Term, 1846, and on the 28th day of the month, an order was obtained which recited that it appeared to the Court by the statement of the plaintiff's counsel, and on inspection of the record, that the original *fi. fa.* had been issued by the Clerk through mistake, for $753 96, instead of $1753 96 cts. and ordering that the said *fi. fa.* so erroneously issued, be cancelled and annulled and a new one for the correct amount be issued; and also directing the late Sheriff, George M. Duncan, to enter upon the new *fi. fa.* any levy or payment which may have been made upon the old one; and accordingly upon said *fi. fa.* George M. Duncan made several entries, the last of which was made some time about the 1st of January, 1840. At the October Term, 1846, of said Court, a controversy arose as to the distribution of certain money arising from the sale of T. & S. Williams' property, between the plaintiff's in this *fi. fa.* and other judgment creditors of T. & S. Williams, when an issue of payment was made and tendered upon the *fi. fa.* of Wiley, Parish & Co. at the instance of C. & G. H. Kelsey & Halstead, which was at the April Term, 1847, withdrawn, and at said term, on motion of counsel, the *fi. fa.* of Wiley, Parish & Co. was set aside, on the ground that it was dormant, and the money then in the hands of the Sheriff, ordered to be paid to the *fi. fa.* of C. & G. H. Kelsey & Halstead. To which decision exception was taken, and the same was reversed by the Supreme Court; and subsequently, money was paid upon said *fi. fa.* by order of the Superior Court, had at October Term, 1848. At the April Term, 1850, of Houston Superior Court, a rule was moved against the Sheriff to pay over the money in his hands, to the *fi. fa.* of Wiley, Parish & Co. when counsel for C. & G. H. Kelsey & Halstead, moved to set aside said *fi. fa.* upon the following grounds:

1st. Because said *fi. fa.* bears date the 28th October, 1846, more than seven years after the signing of the judgment from which it issued; that it is attested by Angus M. D. King, as Judge, who was not at that time Judge, and signed by Lewis J. Jordan, as Clerk, who was not at that time Clerk.

2d. Because said *fi. fa.* is not an alias *fi. fa.* and contains entries prior to its date; the original *fi. fa.* having been, by order of Court, set aside, cancelled, and annulled.

3d. Because the judgment from which said *fi. fa.* purports to have issued, was dormant; said *fi. fa.* not having issued within seven years from the time of signing said judgment.

4th. Because the judgment from which said *fi. fa.* was issued, is, and was, dormant, before the said *fi. fa.* was issued; the original *fi. fa.* issued therefrom, not having any entry made thereon by the proper officer, for more than seven years from the time it issued; and farther, because the original *fi. fa.* was not erroneously issued, but was correctly issued; and that the said original was dormant, and the said established *fi. fa.* was erroneously established, and contained entries which were not on the original *fi. fa.* and said entries were erroneously placed on the said established *fi. fa.*

Which motion the Court sustained, and ordered the *fi. fa.* of Wiley, Parish & Co. to be set aside as absolutely null and void, and the money in the hands of the Sheriff, to be paid to the *fi. fa.* in favor of C. & G. H. Kelsey & Halstead, and other judgment creditors, according to priority.

To this decision, exception was taken, and the same was reversed by the Supreme Court, August Term, 1850, at Decatur.

At April Term, 1851, of Houston Superior Court, counsel for Wiley, Parish & Co. moved a rule *ni si* against the Sheriff, to pay over the money in his hands to the *fi. fa.* in their favor, when counsel for C. & G. H. Kelsey & Halstead, Stoddard, Miller & Co., Hamilton, Houston & Co., Wright, Murphree and John Martin, judgment creditors of T. & S. Williams, made out and tendered an issue upon the said rule; and

moved the Court to set aside the *fi. fa.* and the order and judgment of the Court, passed at the October Term, 1846, authorizing said *fi. fa.* to be issued and cancelled, and annulled the original *fi. fa.* which was issued from the judgment between the said parties, at the April Term, 1839, upon the grounds :

1st. Because said order and judgment was fraudulently obtained. The said G. H. Kelsey & Halstead, and other judgment creditors of T. H. Williams, were not parties to said order and judgment, and the Court was fraudulently deceived, and induced to pass said order and judgment by false representations by the parties thereto ; that the original *fi. fa.* which was issued from the judgment between the parties in 1839, was issued by mistake, for $753 96, instead of $1753 96, principal, called for by said judgment ; and also said original *fi. fa.* contained entries by the proper officer, whereby it was saved from the operation of the Dormant Judgment Act, and the same, together with the judgment from which it issued, was not dormant ; when in fact, said original *fi. fa.* was correctly issued for the sum of $1753 96cts., and the said original *fi. fa.* did not contain entries by the proper officer, as required by the Dormant Judgment Act; and the same, together with the judgment from which it issued, was dormant at that time.     By means of which fraudulent and false representations and pretences, said Court was deceived and induced to pass said judgment, prejudicial to the rights of said C. & G. H. Kelsey & Halstead, and others.

2d.  Because the parties plaintiff and defendant to the judgment passed in 1846, in fraud of the rights of Kelsey, Halstead and others, *colluded together* for the defendants to *consent that said order should be passed by the Court,* knowing that said original *fi. fa.* was correctly issued, and did not contain entries by the proper officer, but was dormant, and that said junior creditors were entitled to a legal preference.

3d.  Because the Court had no jurisdiction or authority to pass said order and judgment, requiring and authorizing the late Sheriff, George M. Duncan, who was there and then out

of office, to enter upon said *fi. fa.* so to be issued, any levy or payments which may have been made or received upon said *fi. fa.* so fraudulently and falsely represented as having been erroneously issued ; and that the said Duncan did falsely and fraudulently enter upon said *fi. fa.* levies and payments which were not upon the said original *fi. fa.*

4th. Because the original judgment between the parties, obtained in 1839, was dormant, under the Act in such cases made and provided, at the time said order of 1846 was passed, and therefore, said order was improperly granted, and in fraud of the rights of said junior judgment creditors, who were not, and could not, be heard upon its passage. On the trial of the issue, which, by agreement of counsel, was submitted to the Court, counsel for C. & G. H. Kelsey & Halstead and others, offered to introduce evidence in support of the several grounds taken in their motion, which was objected to by counsel for Wiley, Parish & Co. The Court sustained the objection and rejected the evidence, upon the ground that the question made had been adjudicated by the Supreme Court, at Decatur, August Term, 1850 ; which decision was carried up and reversed by the Supreme Court, August Term, 1851, at Decatur ; that Court holding and deciding, that the judgment establishing the " alias *fi. fa.* until it shall be reversed or *impeached for fraud,* is conclusive as to the subject-matter which it purports to decide."

At the December adjourned Term, 1852, an issue of fraud was made up between Leroy M. Wiley, Parish & Co. plaintiffs in error, and C. & G. H. Kelsey & Halstead, and other judgment creditors, defendants in error, relative to the entries made upon the new or alias *fi. fa.* in favor of plaintiffs ; and the following testimony of George M. Duncan, taken by deposition, relied on to establish the *fraud.* It was consented and agreed between the parties, that the issue should be referred to the decision of Judge *Irwin,* then and there presiding, and that he should pass upon all matters of fact, as well as of law.

George M. Duncan swore, " that he was Sheriff of Hous-

ton County, in 1834–'5–'8–'9; 1842–'3, and Deputy Sheriff in 1836–'7, 1840–'1. That the annexed *fi. fa.* is the original *fi. fa.* and was in his hands while Sheriff and Deputy Sheriff; that there never was any other in his hands in favor of plaintiff, previous to 1846; witness never made any entry upon the *fi. fa.* To the cross-interrogatories, he answered:

" That, as Sheriff, he received money on said original *fi. fa.* previous to the distribution in 1840, and a distributive portion of which was paid over to Judge Tracy, plaintiff's attorney, in January, 1840. He heard nothing more of the *fi. fa.* until October, 1846. He did not pay to said *fi. fa.* all the money to which it was entitled, in consequence of a mistake made by the auditor, growing out of the error in backing the *fi. fa.* Witness placed certain entries on the alias *fi. fa.* in obedience to the order passed by the Court at that term ; said entries were not made upon the same information witness now possessed.

" Witness had the original *fi. fa.* in his hands at the time of the advertisement in the Georgia Telegraph newspaper, (in pursuance of which advertisement, the property of Williams, out of which was raised the money in controversy, was sold on the first Tuesday in October, 1839 ; said advertisement specifying that the property had been levied on by virtue of a *fi. fa.* in favor of George P. Cooper, and sundry other *fi. fas.* against the Williams'.) This was one of the other *fi. fas.* alluded to in said advertisement, and was considered as levied, though the entry was not made on the *fi. fa.* When the money arising from the sale of the property (specified in the advertisement) was brought into Court, there was some seven or eight *fi. fas.* claiming the money, and the Court referred the whole matter to Charles H. Rice, as auditor, to distribute it. He reported about twenty-two cents in the dollar, coming to each, and this one among them ; and he paid the amount over to Judge Tracy, entered upon it. He kept an execution docket, but does not know where it is."

Judge *Irwin*, after hearing argument, decided that the *fi. fa.* of Leroy M. Wiley, Parish & Co. was not entitled to par-

ticipate in the fund, and ordered that the "alias *fi. fa.*" and judgment on which it is founded, be set aside, on the ground that the order and judgment was fraudulently obtained.

To which decision and judgment of the Court, counsel for L. M. Wiley, Parish & Co. excepted.

WHITTLE, and POE, NISBET & POE, for plaintiffs in error.

GILES and KILLEN, for defendants in error.

*By the Court.*—WARNER, J. delivering the opinion.

[1.] This is the fourth time the *alias fi. fa.* established by the judgment of the Superior Court of Houston County in 1846, has been before this Court. In *Wiley et al. vs. Kelsey et al.* (3 *Kelly,* 274,) it was held, that the execution was *not dormant.* In *Wiley et al. vs. Kelsey et al.* (9 *Ga. R.* 117,) it was held, that the judgment of the Court rendered in 1846, establishing the *alias fi. fa.* in lieu of the original *fi. fa.* recited in such judgment to have been erroneously *issued* through mistake for the sum of $753 96, instead of the sum of $1753 96, as it appeared to the Court, by the statement of the plaintiff's counsel, and on *inspection of the record,* was conclusive as to the facts which it purported to decide, until reversed or set aside, and that such judgment could not be collaterally impeached, or set aside by evidence which that judgment declared to have been *cancelled* and *annulled,* to wit: the original *fi. fa.* which had been produced, and offered in evidence for that purpose. In *Kelsey et al. vs. Wiley et al.* (10 *Ga. R.* 371,) it was held, that the judgment rendered in 1846 might be directly attacked for *fraud* and *collusion,* upon a direct issue made and tendered for that purpose.

Such an issue having been made and tendered by the parties interested in the fund raised by the sale of the property of the defendants in execution, at the December adjourned Term of the Court, 1852, the question of fraud, by consent of the parties in interest, was submitted to the decision of Judge

*Irwin,* who, according to the agreement of the parties, was to pass his judgment upon all the matters of *fact,* as well as of *law.* After hearing the argument of counsel, Judge *Irwin* decided, that the alias execution which issued under the authority of the judgment of 1846, should be set aside, on the ground that the judgment so rendered was *fraudulently obtained.* To which judgment, the plaintiffs in error excepted, and now assign the same for error here.

We distinctly recognize the position assumed by the defendants in error, that the Court is bound to indulge the same presumption in regard to the facts, as it regards granting a new trial in this case, as if it had been submitted to a Jury for their decision and verdict. If the record discloses evidence of *fraud* and *collusion,* in obtaining the judgment, or discloses such facts from which a Jury would have been authorized to have found by their verdict that the judgment of 1846 was *fraudlently* obtained; or if the evidence is in conflict in regard to that point, then a new trial ought not to be granted. But if, on an inspection of all the evidence contained in the record, there is *no evidence of fraud and collusion,* and *no evidence* from which *fraud* could have been *fairly inferred by a Jury,* in regard to obtaining the judgment in 1846, then a new trial should be granted.

After the most careful examination of *all the evidence* contained in the record before us, we have not been able to find any evidence whatever which would authorize a Jury to have set aside and vacated the judgment of the Court rendered in 1846, for *fraud*; but on the contrary, the view which we take of the evidence submitted for that purpose, rebuts all presumption of *fraud,* in the rendition of that judgment.

In the first place, we start with the legal proposition, that every thing is to be presumed in *favor of the regularity and good faith* with which this judgment of a Court of general jurisdiction was rendered.

The only evidence offered to impeach it, is that of George M. Duncan, and the old *fi. fa.* which was *cancelled* by the judgment. Before we proceed to examine the evidence of

Wiley, Parish & Co. *vs.* Kelsey and another.

Duncan in detail, we will first recur to the judgment of 1846; for if the Court and the parties acted in *good faith* from the evidence before them, at the *time the judgment was rendered,* the subsequent development of *new* and *additional* facts, of which they were *wholly ignorant,* going to show that there was *no mistake in the face of the old fi. fa.,* such *new facts* cannot be considered as an *element of fraud,* which will contaminate and avoid a judgment rendered upon evidence which was believed to have been *true.* There is not one tittle of evidence in the record, that any body *had knowledge,* at the time of the rendition of the judgment establishing the *alias fi. fa.* that the original had issued for the *correct amount on its face,* when it was *backed* only for the sum of $753 96.

The judgment recites, " that it appearing to the Court, by the statement of the plaintiff's counsel and an *inspection of the record,* that the Clerk of this Court, by *mistake,* issued execution upon the above stated judgment, for $753 96, instead of $1753 96, called for by said judgment, it is ordered, &c."

The statement of the plaintiff's counsel was doubtless made to the Court as one of the officers thereof, on his *professional oath,* and the record which was inspected, it may fairly be presumed, was the *execution docket,* on which the Clerks most usually enter the amount of the principal, interest and costs, of the executions issued by them, from the amount which is entered on the back thereof. As we have already stated, there is not *one particle of evidence* that any human being *knew* at the time the judgment was rendered, that the old *fi. fa.* on its face, had been issued for the *correct amount;* but when we come to look into Duncan's testimony, it is made quite apparent, that all parties acted on the idea, that it had issued for the *wrong amount,* according to the indorsement on the back of it by the Clerk. After the alias *fi. fa.* has been issued several years under the judgment, and performing its appropriate functions, it is discovered that the old *fi. fa.* issued for the correct amount on *its face,* and that no entries had, in fact, ever been made upon it by the Sheriff. This old *fi. fa.* is attached to interrogatories, to be exhibited to Duncan, the

former Sheriff, who swears " that he was Sheriff of Houston County for the years 1834–'5–'8–'9, 1842–'3, and Deputy Sheriff, for the years 1836–'7, 1840–'1. He identifies the *fi. fa.* as the genuine, original *fi. fa.* ; that it was in his hands while Sheriff and Deputy Sheriff. There never was any other *fi. fa.* in his hands from the same judgment, previous to October, 1846, and did not know of any other *fi. fa.* issuing from the same judgment previous to that time ; he never made any entries, either of levy or payment, on said *fi. fa.* On cross-examination he states, that he does not recollect to have had the *fi. fa.* in his hands since January, 1840 ; the *fi. fa.* was backed for $753 96, when the face of it called for $1753 96. As Sheriff and Deputy Sheriff, he did receive money on said *fi. fa.* previous to a distribution in January, 1840, which money, he paid to Edward D. Tracy, plaintiff's attorney, in January, 1850 ; heard nothing more of the *fi. fa.* until October, 1846. Witness did not pay to said *fi; fa. all* the money to which it was entitled, owing to an error made by the auditor, Charles H. Rice, to whom was referred the calculation upon the distribution of the funds on hand, among the several *fi. fas.,* which error grew out of the error in *backing the execution.* He did place certain entries on the alias *fi. fa.* issued in October, 1846, which entries were then signed by him in obedience to an order of the Court passed at that time. Said entries were not made upon the same information I now possess. I then *supposed said entries were on the annexed original fi. fa. it not being before me, and supposed to be lost.* I had this *fi. fa.* in my hands at the time of the advertisement shown me in the Telegraph. Here the newspaper containing the advertisement of witness' Sheriff's sale for October, 1839, was exhibited to him. The advertisement recites that, on the first Tuesday in October, 1839, the property of the defendants in execution, T. & S. Williams, would be offered for sale, consisting of a stock of dry goods, and other property, levied on to satisfy a *fi. fa.* in favor of George P. Cooper, and sundry other *fi. fas.* against T. & S. Williams. Witness says this old *fi. fa.* was one of the *fi. fas.* alluded to in the advertisement, and

was considered as levied, though the entry was not made on it. When the money was brought into Court, there were a great many *fi. fas.* seven or eight, claiming the money, and the Court referred the whole matter to Charles H. Reid, as auditor, to distribute it; he reported about twenty-two cents in the dollar coming to each, and this among them, and I paid to Judge Tracy under that report, the amount entered on it. This *fi. fa.* would have received more, but was backed for $753.96, when it should have been $1753.96. I kept an execution docket part of the time, while Sheriff, but never entered his levies in it."

The substance of the testimony is, that there was no entry made on the old *fi. fa.* by the Sheriff, prior to October, 1846; that it was in his hands to be levied on the defendants' property in time for the October sale in 1839, and was considered as levied thereon by him, though the entry of the levy was not made on the *fi. fa.*; that when the money arising from the sale of the defendants' property advertised to be sold, and which was sold on the first Tuesday in October, 1839, to satisfy sundry *fi. fas.* this one included among them, was distributed, this *fi. fa.* received its *pro rata* share, considering the true amount of the *fi. fa.* only $753.96, which amount only, was paid over to the plaintiffs' attorney; that he made the entries on the *alias fi. fa.* under the order of the Court in 1846, but said entries were not made upon the same information he now has, for he then supposed said entries were on the original *fi. fa.* which was not before him, and supposed to have been lost.

When the Court in 1846, ordered the *alias fi. fa.* to be issued for the correct amount, it also ordered, " that George M. Duncan, late Sheriff, do enter upon said *fi. fa.* any levy, or payment, which may have been made or received on the execution erroneously issued as aforesaid;" that is to say, the Court, after hearing the evidence of Duncan, as to what entries had been made on the old *fi. fa.* by him, he was directed to make the same on the *alias fi. fa.* which he says he did, but the same were not made on the same information he now

has, in regard to the old *fi. fa.* ; at 'that time, he supposed the proper entries had been made on the old *fi. fa.* and did, as we are bound to presume from the judgment of the Court, so testify before the Court in 1846. There can be no doubt, we think, that the Court in 1846, decided right, according to the evidence then before it, in regard to the issuing the *alias fi. fa.* and the entries which were directed to be made thereon; but if the judgment of the Court had been erroneous, the effect thereof would have been the same, until reversed or set aside.

But it is said that it now appears, that judgment was rendered upon a statement of facts which were false; that the execution issued for the correct amount, and that there were no entries made on the old *fi. fa.* by the Sheriff. The conclusive answer to this argument is, that if the judgment has been obtained by the false testimony of a witness, the 8th section of the 8th division of the Penal Code points out the remedy. *Prince,* 638. When the witness upon whose false testimony the judgment was obtained, shall be prosecuted and convicted of perjury, then the judgment may be set aside on that ground. There is no evidence in this record, that the Court, or the parties, knew that the testimony was false, before or at the time the judgment was rendered; that the Court, and the parties, and Duncan, were mistaken as to the amount specified in the face of the old execution, is quite certain, but it was an innocent mistake, arising from the fact that the Clerk had backed the execution for the wrong amount.

The best evidence that the plaintiffs in the old *fi. fa.* were innocently and honestly mistaken, arises from the fact that they received less than one-half of their *pro rata* share of the money, in the distribution of the proceeds of the sale of the defendant's property; instead of receiving their *pro rata* share of $1753.96, they only received their *pro rata* share of $753. 96. What motive had they to make a fraudulent representation to the Court for the purpose of having the old execution set aside, and a new one issued, unless they believed it had issued for the wrong amount? That they did so believe, is

most clearly manifested by the fact of their receiving less than half of the money which they were entitled to receive, had they known the execution had issued for the correct amount. We think it is also equally clear, that Duncan, the Sheriff, was honestly mistaken when he stated to the Court, that certain entries had been made on the old *fi. fa.* by him. When that statement was made by him in 1846, the old execution was not before him, and was supposed to be lost; he knew that he had levied on the defendants' property in time for October sale in 1839; he knew that this execution was in his hands—that it was considered as levied on the defendants' property, and that it had drawn its *pro rata* share of the money arising from the sale thereof according to the amount indorsed on its back by the Clerk, and that he paid the same over to the plaintiffs' attorney. Knowing all these facts to be true, he supposed he had done his duty by making an entry of his levy on the execution, and then accounting for that levy, as he ought to have done, in accordance with the truth of the facts, as he details them in his evidence. The *fi. fa.* of George P. Cooper, which is in this record, and under which, as well as the sundry other *fi. fas.* mentioned in the Sheriff's advertisement, the defendants' property was levied on, to be sold on the first Tuesday in October, 1839, has no levy entered on it by the Sheriff; and yet there can be no doubt that it was in fact levied, as well as the other sundry *fi. fas.* in his hands at that time, for the reason that the defendants' property was advertised to be sold under said *fi. fas.* and was sold under them; but the Sheriff failed to make an entry of what he had done, on the executions. When we examine the entries made on the *alias fi. fa.* in 1846, we find them to correspond substantially with the statements now made by him in regard to what was done with the old *fi. fa.* In August, 1839, the levy on the defendants' property is entered thereon; then there is an entry stating that on the first Tuesday in October, 1839, the house and lot was sold to Thomson for $1000.00, and the stock of goods sold from month to month until the first Tuesday in January, 1840; then follows an entry shewing the ap-

plication of the money arising from the sale of the property, crediting that *fi. fa.* with $184.00, on the 25th January, 1840. Now, if the old *fi. fa.* had been before the Court in Oct. 1846, and it had appeared to the Court from its face, to have issued for the correct amount, and with the same statement of facts which Duncan now makes, the Court ought, and no doubt would, have ordered the same entries to have been made on that old *fi. fa.* which it ordered to be made on the *alias fi. fa.* for the simple reason, such entries correspond with the truth of the facts in the case. The fact of the levy of the old *fi. fa.* in 1839, in time for October sale, is established by the testimony of Duncan, but the levy was not entered on the *fi. fa.* by him, at the time it was made. The fact of the advertisement and sale of defendants' property, to satisfy this old *fi. fa.* as well as others, is established by him, and the additional fact that this old *fi. fa.* received its *pro rata* share of the proceeds of the sale, according to the amount indorsed on its back, is also established by him; so that, according to the facts proved, the old *fi. fa.* was not dormant, but was active and busy, in the hands of the proper officer, in search of its legal rights, but unfortunately received less than one-half thereof, in the distribution of the money.

There has been no fraud practised, that we can discover, upon anybody, nor any harm done to anybody by the judgment of the Court in 1846, establishing the *alias fi. fa.* and the entries thereon. The entries on the *alias fi. fa.* are precisely such as should have been made on the original, according to the true state of the facts, as disclosed by Duncan's testimony. The whole difficulty has grown out of the clerical error of the Clerk in backing the execution, and the omission of the Sheriff to make his entries thereon, according to the facts, as the same actually transpired, and not the improper conduct of the plaintiffs in the *fi. fa.* for they appear to have been diligent in the prosecution of their legal rights under their execution. The judgment of the Court in 1846, was rendered on evidence which the Court and the parties believed at that time to have been true, as is clearly apparent from all the testimony

in the record, and there is no evidence whatever, going to show that the Court, the parties, or any one else, knew anything to the contrary, in October, 1846. The argument is, but for the entries made on the *alias fi. fa.* by the judgment of the Court in 1846, that *fi. fa.* would be dormant under the Statute; and inasmuch as there were no such entries on the original *fi. fa.* which would have taken it out of the operation of the Dormant Judgment Act, therefore, the judgment of 1846, was fraudulently obtained as against the defendants in error, who are junior judgment creditors. The answer to this argument is, that the old *fi. fa.* would not have been dormant, according to the evidence of Duncan, and the judgment of this Court, (in 3 *Kelly* 274,) and had it been before the Court in 1846, in the exact condition it now is, the Court would, as it ought to have done, (according to the truth of the facts, as now stated by Duncan,) ordered the same entries to have been made on the old *fi. fa.* which it ordered to be made on the *alias fi. fa.*, so that the junior creditors are in no worse condition than they would have been, according to the true statement of the facts of the case, if the judgment of the Court in 1846, establishing the *alias fi. fa.* and the entries thereon, in lieu of the original, had never been rendered.

The *alias fi. fa.* and the entries thereon exhibit the truth of the facts as the same transpired, according to the testimony of Duncan, as to what was done under the old *fi. fa.* and nothing else but the truth, and consequently, there was no fraud, either in law or fact, in obtaining the judgment of 1846, apparent on the face of this record.

Let the judgment of the Court below be reversed.